**SIERRA CLUB; Wisconsin Forest Conservation Task Force; and Wisconsin Audubon Council, Inc., Plaintiffs,**

**v.**

**Floyd J. MARITA as Regional Forester of the Eastern Region of the Forest Services, United States Department of Agriculture; F. Dale Robertson as Chief of the Forest Services; and Michael B. Hathaway as Forest Supervisor of the Nicolet National Forest, Defendants.**

Civ. A. No. 90–C–0336.

United States District Court,
E.D. Wisconsin.

Feb. 9, 1994.

---

Walter Kuhlmann, Boardman, Suhr, Curry & Field, Madison, WI, for plaintiffs.

Wells D. Burgess & Louise Milkman, U.S. Dept. of Justice, Environment & National Resources Div., General Litigation Section, Washington, DC, for defendants.

## DECISION AND ORDER

REYNOLDS, District Judge.

In this action, filed April 2, 1990, plaintiffs, three conservation groups, claim that the United States Forest Service ("the Service") violated various statutory and regulatory

provisions by failing to consider basic principles of ecology in developing a management plan for the Nicolet National Forest ("the Nicolet"). Plaintiffs further claim that the Service failed to provide adequate opportunities for "remote" forms of forest recreation and failed to consider a sufficient range of alternative forest plans. Both sides have filed motions for summary judgment, on which oral argument was heard September 3, 1992. For reasons set forth below, the court now denies the motion filed by plaintiffs and grants the motion filed by defendants.

This action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Jurisdiction in this court is based upon 28 U.S.C. § 1331.

## I. Overview

The Nicolet National Forest, whose boundaries encompass almost a million acres in northeastern Wisconsin, of which about 655,-000 acres are national forest land, is managed according to the prescriptions set forth in a rather detailed document, the "Land and Resource Management Plan," issued by the Service. Development of the current plan, which covers the period from 1986 to 1995, began in 1980 under the direction of the Nicolet Forest Supervisor, Jim Berlin ("Berlin"). A draft version of the plan was formally issued to the public on November 9, 1984, along with a draft environmental impact statement comparing the impact of the draft

plan to that of several alternative plans. There followed, pursuant to 16 U.S.C. § 1604(d), a period of public comment, as a result of which the draft plan was modified in certain respects.

On August 11, 1986, the Service's Regional Forester for the Eastern Region ("Regional Forester" or "regional office"), which includes the Nicolet, issued the final plan, the final environmental impact statement ("FEIS"), and a Record of Decision explaining why the plan had been approved. The plan then was challenged in an administrative appeal by various citizens' groups, including the instant plaintiffs. On February 22, 1988, Service Chief F. Dale Robertson ("the Chief") issued a decision affirming the plan in part and remanding it in part to the Regional Forester.

Plaintiffs Sierra Club, Wisconsin Forest Conservation Task Force, and Wisconsin Audubon Council, Inc., are organizations dedicated to the enjoyment, study, and conservation of forests and other natural resources. Members of each organization use the Nicolet for scientific and recreational purposes, which allegedly will be adversely affected by implementation of the plan. (Compl. at ¶¶ 5–7; Jan. 21, 1992 Aff's of George Hall, Emmet Judziewicz, Donald Waller, William Alverson, Jean Anderson, Jim Young, Clark Gaskill.[1]) Plaintiffs raise three distinct but related claims.

1. Sierra Club member George Hall, who since 1975 has regularly hiked, skied, canoed, and bushwhacked in the Nicolet, claims he is injured by the forest's decreasing capacity for recreation in remote areas, which capacity would be further decreased as a result of the forest plan. (Hall Aff. at ¶¶ 7, 8, 12, 13.) Sierra Club member Emmet Judziewicz, a botanist who has been visiting the Nicolet since 1954, claims his personal and professional interest in observing the forest's flora and fauna will be adversely affected by the forest plan's failure to provide adequately for biological diversity. (Judziewicz Aff. at ¶¶ 1, 9, 10.)

Wisconsin Forest Conservation Task Force ("Task Force") member Donald Waller, a ecologist who studies, skis, hikes, camps, canoes, and bird-watches in the Nicolet, claims his enjoyment of these activities would be adversely affected by the landscape fragmentation that the forest plan would cause. (Waller Aff. at ¶¶ 4–6.) The same goes for Task Force member William Alverson, a botanist who has studied, skied, and hiked in the

Nicolet since the mid–1980s. (Alverson Aff. at ¶¶ 1, 3–8.)

Wisconsin Audubon Council, Inc., ("Wisconsin Audubon") member Clark Gaskill, who has camped, hiked, and cross-country skied in the Nicolet since the early 1950s, claims the intensive management prescribed by the forest plan will adversely affect his aesthetic enjoyment of the forest. (Gaskill Aff. at ¶¶ 1, 4.) Wisconsin Audubon member Carol Jean Anderson, a frequent birdwatcher in the Nicolet since at least 1989, claims the forest plan would adversely affect her enjoyment of that activity because its prescriptions for logging and road construction would threaten the survival of several birds. (Anderson Aff. at ¶¶ 1, 3–6.) Wisconsin Audubon member Jim Young, a professional nature photographer who does most of his work in the Nicolet and lives in property abutting it, claims his personal and professional enjoyment of the forest would be adversely affected by the forest plan's prescriptions for logging and road construction. (Young Aff. at ¶¶ 1–6, 9.)

First, they claim that in developing the plan, the Service ignored important scientific principles and, as a result, failed to consider the plan's effect on "biological diversity," thereby violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, which requires a "hard look" at the environmental consequences of federal action, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, which governs the development of forest plans and requires that they provide for biological diversity, and the Multiple–Use Sustained–Yield Act ("MUSYA"), 16 U.S.C. § 528 *et seq.*, which bars impairment of the productivity of the land.

Second, plaintiffs claim that the Service failed to provide adequate opportunities for "remote" forms of recreation, in violation of the NFMA, 16 U.S.C. §§ 1604(e)(1), (g), and associated regulations, which, together with MUSYA, 16 U.S.C. § 528, identify recreation as one of the purposes of the national forest system and require the Service to provide a "broad spectrum" of recreational opportunities and to inventory the forests' recreational resources. Finally, plaintiffs claim the Service violated NEPA, 42 U.S.C. § 4332(2)(C)(iii), and associated regulations, by failing to consider an adequate range of alternative forest plans with more varied amounts of logging and road building.

Because each of these claims is brought pursuant to the APA, the challenged action may be set aside only if shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). With this standard in mind, the court will address the merits of plaintiffs' claim, after first reviewing their standing to challenge the Nicolet forest plan and the "ripeness" of the instant dispute.

## II. Standing and Ripeness

### A. Background

The plan, a document the size of a suburban phone book, establishes fairly specific objectives for recreational and commercial use of the Nicolet over the period of a decade or so and prescribes management practices necessary to achieve those objectives and to fulfill other statutory requirements. The objectives for recreational use are classified according to several different forms of recreation—"developed," "dispersed," "wilderness," and hunting, fishing, and trapping—and are quantified in terms of "visitor days per year." (Plan at 22.)[2] The objective for timber harvesting is set at 97 million "board feet" of timber per year, allocated among six categories of timber type, each of which is subclassified according to harvest method, age-class, and forest district (there are four of them). (*Id.* at 22, 25–27, 33–35.)

To accomplish these objectives, the plan sets forth a number of management prescriptions to be implemented over the course of ten years, specifying (among other things) the number of miles of roads to be maintained, closed, and newly constructed; the number of new campsites and trails to be constructed; and the acreage of "wildlife openings" to be maintained, trees to be harvested, and trees to be "regenerated." (*Id.* at 23–24.) Also, the plan divides the forest into dozens of smaller geographic sections, each of which is identified by one of 16 "Management Areas" that represent different combinations of management practices and recreational environments. (*Id.* at 83–156.)

Finally, the plan sets forth a number of forest-wide "guidelines necessary to implement" the plan's management prescriptions. (Plan at 36, 37–82.) The guidelines range from general policy statements concerning, for example, the construction of trails and recreation areas, to quite specific instructions concerning timber harvesting methods, the protection of "sensitive" species, and the construction of roads. (*Id.*).

### B. Analysis

 A case or controversy for purposes of Article III arises where an injury, the

---

2. For example, the plan provides that the forest will have the capacity for visitors to spend a total of 353,000 days per year in "developed recreation." (*Id.*) In this context, a "day" represents any twelve hours spent in the forest by a single person over the course of the year. (*Id.* at 182.)

invasion of a "concrete" and legally cognizable interest, has occurred or is "imminent," is traceable to the defendant's action, and is redressable by a decision in the plaintiff's favor. *Lujan v. Defenders of Wildlife,* ––– U.S. –––, –––, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). There is no question that the alleged injury in this case concerns a concrete, legally cognizable interest—personal and professional enjoyment of the Nicolet environment—nor that plaintiffs and their members would themselves be "among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972). Defendants contend, however, that plaintiffs' injury is not imminent because the source of the anticipated injury is not the plan itself but implementation of the plan, which must await the development of site-specific projects (such as individual timber sales) that will be subject to their own environmental analyses. *See* 40 C.F.R. §§ 1502.14(d), 1508.9(b). Thus, defendants insist, though plaintiffs will have standing to challenge such projects as they are developed, they do not have standing to challenge the plan as a whole.

The court disagrees. Contrary to defendants' assertion, the plan does not "merely state[ ] guidelines and parameters to be followed in the event a project is undertaken." (Mar. 6, 1992 Def.Br. at 3.) While the plan certainly includes such guidelines and parameters, it also sets forth, as indicated in the previous section, a whole array of exceedingly specific management "prescriptions" that are in no sense conditional or optional. Consider the following regulations:

> Plans guide all natural resource management activities and establish management standards and guidelines for the National Forest System. They determine resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management.
>
> \* \* \* \* \* \*
>
> As soon as practicable after approval of the plan, the Forest Supervisor shall ensure that, subject to valid existing rights, all outstanding and future permits contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the plan. Subsequent administrative activities affecting such lands, including budget proposals, shall be based on the plan.

36 C.F.R. §§ 219.1(b), § 219.10(d). Similarly, the FEIS provides:

> After the Plan is approved the [Nicolet office] will begin implementing it by producing the goods and services in the amounts specified in the Plan, using the management prescriptions specified, and adhering to the standards and guidelines included in the prescriptions.

(FEIS, App. B at 8.)

Thus, while the plan does not itself spell out the numerous site-specific projects necessary to its implementation, it clearly does require that such projects be undertaken, and it dictates their cumulative effect, which, after all, is what plaintiffs are concerned about. Moreover, barring amendment or revision (*see* 36 C.F.R. §§ 219.10(f), (g)), neither of which is said to be in the offing, the plan is certain to be implemented in its current form. Thus, because the current plan mandates, in quite specific terms, the very management activity that will ultimately cause plaintiffs' injury, the fact that the Service has yet actually to *inflict* the injury through the development of site-specific projects does not render the injury "conjectural" or "speculative" and therefore does not deprive plaintiffs of standing to challenge the plan. *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1516 (9th Cir.1992). *See also Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n,* 679 F.2d 1218, 1221–22 (7th Cir.1982).

■ Plaintiffs also have standing to challenge the adequacy of the FEIS. Indeed, such a challenge may be brought even absent a showing that injury is imminent and redressable; it is enough that the alleged injury concerns a concrete and legally cognizable interest that "could" be impaired as a result of the agency's failure to prepare the FEIS properly. *Defenders of Wildlife,* ––– U.S. at ––– n. 7, 112 S.Ct. at 2142 n. 7. In this case, plaintiffs contend, if the Service had considered basic ecological principles in its

environmental analysis it might have sought to avoid or mitigate plan prescriptions that contribute to excessive forest fragmentation, the source of plaintiffs' injury. That gives plaintiffs standing to challenge the FEIS.

■ Repackaging their position on standing, defendants also contend that since site-specific projects have yet to be developed, the dispute over the forest plan is not "ripe" for adjudication. Here, defendants rely principally upon *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 890, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990), which held that a general category of actions and decisions by the Bureau of Land Management was not "agency action" under the APA, 5 U.S.C. § 702, and therefore was not ripe for review, because the actions and decisions, though related as a factual matter, had not been formally grouped into a "completed universe." Absent such formal grouping by the agency or by statute, the court held, a category of actions and decisions that may constitute a "program" in the abstract "cannot be laid before the courts for wholesale correction under the APA." 497 U.S. at 893, 110 S.Ct. at 3191.

Unlike the actions and decisions at issue in *National Wildlife Fed'n,* however, the collection of decisions that make up the forest plan *is* formally treated as a single agency action. *See:* 36 C.F.R. § 219 Subpart A; 36 C.F.R. § 219.10(d) (providing for administrative appeal of "the Regional Forester's decision to approve a forest plan"). Thus, notwithstanding the need to develop site-specific projects, the forest plan is ripe for review. *Idaho Conservation League,* 956 F.2d at 1518–19.

The court now turns to the substance of plaintiffs' claims.

### III. Biological Diversity

#### A. Statutory, Regulatory Background

■ The NFMA, enacted in 1976, was designed to provide a "comprehensive framework for the development and implementation of [forest] management plans" consistent "with the principles of multiple-use and sustained-yield" that had been set forth in MUS-YA. S.Rep. No. 94–893, 94th Cong., 2d Sess. at 8, 10 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6662, 6668, 6671, Section 6(g) of the NFMA directs the Secretary of Agriculture to promulgate regulations governing the development of management plans. 16 U.S.C. § 1604(g). The regulations are to include, among other things, guidelines that:

> provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan.

16 U.S.C. § 1604(g)(3)(B).

The required regulations, promulgated in 1979 and revised in 1982, include two sets of guidelines corresponding to the diversity language of Section 6(g)(3)(B). The first set concerns the place of biological diversity in forest planning generally:

> Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices.

36 C.F.R. § 219.26.

The second set of diversity guidelines is addressed to the actual content of management plans:

> Management prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities, including endemic and desirable naturalized plant and animal species, so that it is at least as great as that which would be expected in a natural forest and the diversity of tree species similar to that existing in the plan-

ning area. Reductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives.

36 C.F.R. § 219.27(g). For purposes of these regulations, "diversity" means "the distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3.

Closely related to the diversity provisions (perhaps designed to implement them) are regulations concerning protection of the "Fish and Wildlife Resource." 36 C.F.R. § 219.19. These regulations require, first, that the Service manage "[f]ish and wildlife habitat ... to maintain viable populations of existing native and desired non-native vertebrate species." *Id.* Accordingly,

habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

*Id.* The second requirement of the fish and wildlife regulations is that the Service estimate and monitor the effect of forest management on the populations of certain "management indicator species." 219.19(a)(1)–(7). These species, which may be plant or animal, vertebrate or invertebrate, must include, "where appropriate," representatives of the forest's threatened and endangered species, species with "special habitat needs," common game species, "non-game species of special interest," and species whose "population changes are believed to indicate the effects of management activities on other species ... or on water quality." 36 C.F.R. § 219.-19(a)(1).

In sum, the NFMA and associated regulations create three requirements related to biological diversity: that forest planning provide for diversity of plant and animal communities, that viable populations of vertebrate species be maintained, and that the effect of management prescriptions on populations of management indicator species be monitored. Defendants' method of addressing these re-

quirements is set forth below, followed by a discussion of the ecological principles that plaintiffs claim defendants ignored.

**B. The Service's Approach to Biological Diversity**

**1. The Wildlife Habitat Diversity Index**

The Service claims it satisfied the NFMA's diversity provisions by conducting the required population viability and indicator species analyses and by conducting a separate analysis of "vegetative diversity." The latter analysis was based on the Service's assumption that overall biological diversity was mainly a function of "diversity of habitats," and that diversity of habitats was mainly a function of "vegetative diversity." (FEIS, App. D at 3.) The level of vegetative diversity occurring throughout the forest was found to depend on three variables: distribution of timber type, variety of timber age-class, and the level of "wildlife management investment," which refers to the percentage of land under a "high recreation/wildlife management intensity." (FEIS, Chpt. 3 at 26–27, App. D at 28.)

Distribution of timber type was deemed important because different timber types provide or are associated with different qualities of habitat. (*Id.,* App. D at 21–25.) Tree types were deemed particularly beneficial to "wildlife habitat" if, among other things, their structure or canopy creates "cover," if they are associated with diverse "understory" shrubbery, if they create "snags" for dens and the like, if they typically grow in stands of diverse tree species, and if they are harvested on a "short rotation." (*Id.*)

Based apparently on these criteria, the Service concluded that the best forest plan in terms of diversity would increase the total acres of Jack Pine, Balsam Fir, and Aspen, and decrease the total acres of Red Pine, White Pine, White Spruce, Mixed Hardwoods, and Lowland Conifers. (*Id.,* App. D at 21–25.) Accordingly, the Service determined that the total acres of each timber type should account for the following percentages of the total forest acreage: Jack Pine, 4.3 percent (up from 2.5 percent); Balsam Fir, 4.7 percent (up from 3.4 percent);

Aspen, 27.9 percent (up from 23.2 percent); Red Pine, White Pine, and White Spruce combined, 10.8 percent (down from 12.6 percent); Mixed Hardwoods, 41.2 percent (down from 46.5 percent); and Lowland Conifer, 11.1 percent (down from 11.8 percent). (FEIS, App. D. at 13, 16.)

Variety of timber age-classes was included as the second variable in the Service's diversity analysis apparently on the assumption that, like different timber types, trees at different stages of growth provide or are associated with different kinds of habitat. (FEIS, App. D at 25.) The Service found that, in general, the optimal mix of age-classes would be achieved by distributing tree populations evenly among different age-classes, resulting in a "balanced age class structure." (*Id.*, App. D at 25.) The following table sets forth the existing and desired age-class mix as determined by the Service:

| Type | Age | Existing | Desired |
|---|---|---|---|
| Jack Pine | 0–10 | 5 | 18 |
| | 11–40 | 4 | 54 |
| | 41 + | ·91 | 28 |
| Balsam Fir | 0–40 | 10 | 72 |
| | 41 + | 90 | 28 |
| Red Pine, White Pine, & White Spruce | 0–20 | 15 | 26 |
| | 21–40 | 16 | 26 |
| | 41–60 | 55 | 26 |
| | 41 + | 14 | 22 |
| Mixed Hardwoods | 0–11 | 0 | 10 |
| | 11–60 | 64 | 45 |
| | 61 + | 36 | 45 |
| Aspen | 0–10 | 22 | 20 |
| | 11–20 | 22 | 20 |
| | 21–30 | 1 | 20 |
| | 31–40 | 8 | 20 |
| | 41 + | 47 | 20 |

(*Id.* at 2–12 (Table 2–6).)

As noted above, the third variable in the Service's assessment of biological diversity was the percentage of forest land subject to a "high recreation/wildlife management intensity," which reflects:

the number of permanent forest openings maintained, the amount of special wildlife areas such as grouse hunter trail systems and deer winter range management areas, and ... the amount of on-the-ground wildlife coordination which is carried out in any alternative.

(*Id.*, App. D at 28.) Of these factors, the Service placed particular emphasis on the total acreage of permanent forest openings maintained, apparently because many species thrive on the edge of forested areas or in clearings, rather than within the forested areas themselves. (*Id.*, App. D. at 27–28.) The Service found that for diversity purposes, the optimal number of acres under

wildlife management investment would be 468,000, or 85 percent of the "total manageable lands" in the Nicolet. (FEIS, App. D at 29.)

The optimal values for each of the three diversity variables are set forth not only for the forest as a whole, but also for each of four "socio-economic zones" into which the forest is divided. The zones represent different geographical areas of the forest and are associated with different demographic and economic patterns. (FEIS, Chpt. 3 at 44–45.)

After assigning optimal values to each of the three variables, the Service used these values as benchmarks for estimating the degree to which each of the eight alternative forest plans would contribute to biological diversity. The result was a Wildlife Habitat Diversity Index, which lists the percentage of each alternative's conformity to the optimal management prescriptions. (*Id.*, App. D at 31.) For the timber type variable, that percentage is determined as follows: each timber type's prescribed percentage of the total forest is subtracted from its optimal percentage, the differences added together, and their sum subtracted from 100. (*Id.*, App. D at 30.)[3] It is unclear exactly how the diversity indices for the other two variables were calculated. (*Id.*, App. D at 29–31.)

Because separate diversity indices were calculated for each of three variables and for each of four socio-economic zones, each alternative forest plan generated 12 sub-indices. To arrive at a total diversity index, the sub-indices were added together and their sum divided by 12, thereby according equal weight to each of the three variables. (*Id.*) The table below lists the Service's diversity indices for each alternative, excluding the breakdown by socio-economic zone.

| Indices | Alternatives | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Type | 58 | 62 | 58 | 58 | 77 | 95 | 75 | 48 |
| Age–Class | 52 | 50 | 65 | 42 | 66 | 91 | 36 | 40 |
| W.M.I. | 60 | 59 | 11 | 53 | 61 | 100 | 41 | 78 |
| TOTAL | 57 | 57 | 45 | 51 | 68 | 95 | 51 | 55 |

(*Id.*, App. D at 31 (Figure D–5).) As the numbers indicate, Alternative 6 was the alternative designed to maximize biological diversity. Alternative 5 represents the plan that was adopted.[4]

3. For example, under the optimal plan for diversity, Aspen would account for almost 21 percent of the forest in the Eagle River socio-economic zone. (*Id.*, App. D at 30.) Under Alternative 6, Aspen accounts for about 20 percent of the timber in that zone, a difference of one percentage point from the optimal percentage. (*Id.*) For the other timber types in that zone, the differences between optimal and prescribed percentages are 0, 2, 1, 3, 0, and 0. (*Id.*) Because these differences, together with the difference for Aspen, add up to 7, the Alternative 6 diversity index for the Eagle River socio-economic zone is 93. (*Id.*)

4. See note 17, *infra*, for a brief description of each alternative.

According to the FEIS, the Service compared the alternative forest plans on the basis of several variables that were not incorporated into the diversity analysis. (*Id.*, App. D at 26–28.) Among these was total acreage of old-growth forest, of which the FEIS states:

> The total number of wildlife species associated with the mature and old growth forest condition is about equal to the number associated with the regenerating and young timber condition.
>
> * * * * * *
>
> Both managed and unmanaged old growth will occur as scattered small areas across the Forest with the exception of large designated wilderness areas.

(*Id.*, App. D at 26.) Another factor the Service studied but did not incorporate into the diversity analysis was total acreage of forest occurring in "large areas of low human disturbance." (*Id.*, App. D at 27.) Of this factor, which was quantified in terms of "total wilderness, old growth, and other modified road management areas in blocks over 1,000 acres," the FEIS states: "Certain wildlife species are sensitive to human disturbance and are thus associated with large areas of no roads, closed roads, or reduced roads." (*Id.*)

### 2. Population Viability Analysis

The Service began its population viability analysis, required under 36 C.F.R. § 219.19, by compiling a list of "all rare and uncommon vertebrate wildlife species" and of various other species "associated with habitats subject to significant change through planning alternatives." (Nov. 15, 1991, Def's Br., Ex. A at 1.) Sixty-five of the species on the list were identified as "needing" a population viability analysis. (*Id.*, Ex. A at 2.) The sixty-five were then grouped by habitat type, resulting in fourteen categories of habitat. (*Id.*, Ex. A at 10–11, Table 4.) The habitat for each of the 65 species was identified by reference to a 1984 inventory of the Nicolet's species and associated habitats, in which "forested habitats" are divided into 17 differ-

ent combinations of timber type and age-class, and "nonforested habitats" are divided into "upland openings," "rural human settlements," "open water," "riparian zones," and five categories of "wetlands." (*Id.*, Ex. C at 40–60.) From each of the 14 habitat categories into which the 65 species were grouped, the specie requiring the largest "territory" was selected for the viable population analysis, on the assumption "that if adequate habitat is available to maintain viable populations of these 14 species, then adequate habitat will be available for all associated species." (*Id.*, Ex. A at 2.)

To determine whether viable populations of the 14 species would be maintained, the Service multiplied the amount of each specie's habitat that would be available after 150 years under each alternative forest plan by the specie's population density, resulting in an estimated population size. (*Id.*, Ex. A at 12, Table 5.) The Wild Turkey, for example, is associated with Oak and has a population density of 1 per 100 acres; under Alternative 5, there would be 22,880 acres of Oak after 150 years, resulting in an estimated population size for the Wild Turkey of 229. (*Id.*)[5]

Based on estimated population size, the Service calculated the probability that the specie would begin to inbreed after 150 years. (*Id.*, Ex. A at 27, Ex. C at 11.) An "inbreeding coefficient" of 0.5 or greater indicates that the specie will become extinct. (*Id.*, Ex. C at 11.) Under Alternative 5, the forest plan, none of the 14 species analyzed for population viability would have an inbreeding coefficient of 0.5 or greater for the forest as a whole, though some of them would reach that number when population size is broken down by socio-economic zone. (*Id.*, Ex. A at 27, 30.)

### 3. Management Indicator Species Analysis

Pursuant to 36 C.F.R. § 219.19(a), the Service selected thirty-three species (no plants or invertebrates) as management indicator species for the Nicolet. (Nov. 15, 1991, Def's

---

**5.** The estimated population size is adjusted somewhat to arrive at an "effective" population size, which takes account of the likelihood that theoretical population density will not match actual population density. (*Id.*, Ex. E at 10.)

Br., Ex. B at 23.) For each of them, the Service identified the specie's associated habitat and multiplied the amount of such habitat provided for in each alternative forest plan by the specie's population density, just as it had done for the species analyzed for population viability, to arrive at an estimated population size. (*Id.*, Ex. B at 24–27, 29.) Further, the Service established a plan for monitoring the populations of the indicator species in the future. (*Id.*, Ex. B at 32–40.)

### C. Plaintiffs' Objections to the Service's Approach

#### 1. Conservation Biology

■ Plaintiffs challenge the Service's approach to diversity largely on the basis that it ignored the ecological consequences of "forest fragmentation," as predicted by the science of conservation biology. This science demonstrates, plaintiffs say, that biological diversity of a particular region depends on several interrelated factors bearing upon the quality of the region's habitats. Prominent among these factors are the size of the habitats, or "patch size," and the extent of disturbance within the habitats. (VII Admin.Rec. at 1848–1854.) The science holds that a habitat must be sufficiently large and undisturbed that "minimum viable populations of sensitive species [can remain or recolonize within the habitat] after a catastrophic disturbance." (*Id.* at 1851.) Based upon the size of the area typically affected by such disturbances, plaintiffs estimate that a patch size of 50,000 acres is minimally necessary. (*Id.* at 1852.)

Another factor that conservation biology deems relevant is the degree of accessibility between similar geographical habitats. The science predicts that as similar habitats become increasingly isolated from each other, biological diversity declines because organisms cannot survive disturbances in one habitat by migrating to another. (*Id.* at 1863–74.) This is known as the theory of "island

biogeography," so-named because it is derived from the study of biological diversity on oceanic islands.[6] (*Id.* at 1863–64.) The same theory has been applied to purely terrestrial habitats, where, for example, "islands" of old-growth forest are surrounded by a "sea" of young or clear-cut forest, thereby isolating the organisms dependent on old-growth habitat. (Sept. 9, 1991 Kuhlmann Aff., Ex. N(13) at 63; VII Admin.Rec. at 1864, 1873; Sept. 12, 1991 Pl.Br. at 24–27.)

The third factor plaintiffs identify as crucial to conservation biology is the extent to which a habitat is penetrated by adverse external forces, or "edge effects," from adjacent habitats. (*Id.* at 1874–90.) Edge effects would include, for example, the invasion of an old-growth forest by plants and animals (deer are of particular concern) from a surrounding younger forest. (*Id.* at 1877–78, 1888.) If the invasion extends, say, a quarter-mile into the old-growth forest, and the entire habitat is only a half-mile wide, the organisms dependent on the old-growth forest may be effectively deprived of their habitat. (*Id.* at 1875.) Thus, the presence of edge effects is believed to be pertinent to determining how large a habitat must be.

Plaintiffs contend that conservation biology and the associated concepts of "patch dynamics," "island biogeography," and "edge effects," represent well-accepted scientific theory. The theory is based, according to plaintiffs' submissions to the Service, mainly on scientific literature dating from the 1970s (*Id.* at 1849–51, 1855, 1860, 1862, 1864–67, 1871–72, 1876–80, 1885), though it relies as well on scholarship of the 1960s. (*Id.* at 1855, 1863, 1864.) The bibliography plaintiffs submitted to the Service includes a number of sources from the 1970s and early 1980s discussing, in terms of conservation biology, the biological significance of a forest habitat's size, internal fragmentation, isolation from other habitats, and edge effects. (Sept. 12, 1991 Pl.Statement of Facts at 23–36; VIII Admin.Rec. at 2158–66, 2191–97.)[7] Several of these sources

---

**6.** Because both island biogeography and conservation biology stress the importance of patch size, the two terms often are used interchangeably.

**7.** Examples:

Diamond, J.M., Professor of Physiology at UCLA, discussing "design principles [that] will minimize extinction rates in natural reserves," states:

A large reserve is better than a small reserve (principle A).... The reserve should generally

confirm the applicability of island biogeography to continental forest reserves. (Sept. 12, 1991 Pl.Statement of Facts at 23–36; VIII Admin.Rec. at 2162, 2163, 2165, 2166, 2197.) [8]

Relying on some of the same sources, a 1983 article published by the Service (and submitted to the court by defendants) states:

> It is man's indirect effects, through population isolation and habitat alteration (a form of competition for resources), that hold the greatest danger for most species. . . .
>
> \* \* \* \* \* \*
>
> Man dramatically changes the natural patterns of habitats through land use decisions. This often isolates wildlife and fish populations. And, man alters the habitats within a particular land use situation. This often fragments and reduces the populations of some species.

(Nov. 15, 1991 Def's Br., Ex. E at 6.) The principal author of that article, United States Fish and Wildlife Service official Hal Salwasser, commented in another paper: "Island Biogeography theory and empirical knowledge are the foundation of the role of pattern diversity in National Forest Management." (VII Admin.Rec. at 1873.)

Plaintiffs' general position was endorsed before the Service by thirteen experts on biological diversity, they being of the unanimous opinion that such diversity cannot be maintained in the Nicolet unless a meaningful portion of it is reserved for large tracts (i.e., at least 30,000 to 50,000 acres) of relatively undisturbed forest. (VIII Admin.Rec. at 2167–2191.) As one expert put it:

> Supporting large reserves these days is like supporting motherhood. The overwhelming consensus among ecologists and biogeographers is "the larger the better."

(*Id.* at 2186.)

Accordingly, plaintiffs proposed on administrative appeal that the Nicolet plan be modified to provide for the establishment of three "Diversity Maintenance Areas" ("DMAs"), two consisting of about 60,000 acres and the third consisting of about 40,000 acres; together, these areas would account for almost a quarter of the national forest. (VII Admin.Rec. at 1923.) No timber harvesting or road construction would take place on the DMAs, according to plaintiffs' proposal, and all existing roads, save town roads, county, state, and federal highways, and certain Service "class A roads," would be "closed and gated." (*Id.*) The DMAs would remain available, however, for other activities such as "hiking, fishing, skiing, hunting, camping

---

be divided into as few disjunctive pieces as possible (principle B). . . . If the available area must be broken into several disjunctive reserves, then these reserves should be as close to each other as possible, if the habitat is homogeneous (principle C).
(Sept. 12, 1991 Pl. Statement of Facts at 25–26 (quoting Diamond, J.M., "The island dilemma: lessons of modern biogeographic studies for the design of natural preserves," Biological Conservation 7:129–46 (1975) (cited, VIII Admin.Rec. at 2192.)))
A general text on ecology states:
. . . [R]ecall that different species have different area requirements and that species requiring large areas are often the ones most threatened by man's activities and in need of protection. On these grounds, fragmenting a large reserve into several smaller reserves is a bad rather than a good policy. [Citations omitted.] . . . [T]here is the obvious point that some "edge" species, that thrive at the interface between habitats, will prefer several smaller parks . . . [C]onversely, edge-intolerant species will be differentially worse off with several smaller areas, and will be unable to survive once the reserves become too small.
(Sept. 12, 1991 Pl. Statement of Facts at 28–29 (quoting May, R.M. (ed.), Theoretical Ecology: Principles and Applications (2d ed. 1981) (cited, VIII Admin.Rec. at 2194.)))

8. Examples:
MacArthur, R.H., and Wilson, E.O., state: "Many of the principles [of island biogeography] graphically displayed in the Galapagos Islands and other remote archipelagos apply in lesser or greater degree to all natural habitats." (Sept. 12, 1991 Pl. Statement of Facts at 24 (quoting The Theory of Island Biogeography (1967) (cited, VIII Admin.Rec. at 2162.)))
Wilcox, B.A., states:
One of the most profound developments in the application of ecology to biological conservation has been the recognition that virtually all natural habitats or reserves are destined to resemble islands, in that they will eventually become small isolated fragments of formerly much larger continuous natural habitat.
(Sept. 12, 1991 Pl. Statement of Facts at 34 (quoting "Insular ecology and extinction," in Soule, M.E., and Wilcox, B.A. (eds.) Conservation Biology: An Evolutionary–Ecological Perspective (1980) at 95–117 (cited, VIII Admin.Rec. at 2166.)))

and snowmobiling on designated trails." (*Id.*) Plaintiffs submitted maps describing where each of the DMAs should be situated. (*Id.* at 1705–08.)

### 2. The Service's Response to Plaintiffs' Position

The Service declined to set aside undisturbed areas of the size proposed by plaintiffs and chose not to address the issue of forest fragmentation because it found that the theory of island biogeography had not been shown to be applicable to the habitats of the Nicolet. (Plan at 17; Record of Decision at 11, 16–18; Sept. 12, 1991 Kuhlmann Aff., Ex. N(16) at 2.) That finding was based on the fact that the theory, according to the Service, had been developed mainly in studies of non-forest habitats such as oceanic islands and deserts. (Sept. 12, 1991 Kuhlmann Aff., Ex. N(16) at 2.) The Service noted, further, that to the extent the theory had been applied to forests, "[t]he majority of the research has been conducted in the Pacific Northwest's old growth forests which are managed exclusively under the even aged system," rather than under the system of combined even-aged and uneven-aged management followed in the Great Lakes area.[9] (Plan at 17; Record of Decision at 17.)

The Service also concluded that even if island biogeography were found applicable to the Nicolet, still the theory would not require the establishment of large blocks of undisturbed forest. The Service cited biologist Larry Harris, author of "The Fragmented Forest," for the proposition that biological diversity could be preserved by maintaining numerous small habitats in place of a few large ones, and for the further proposition that the need for large habitats is minimized if timber is harvested on "long rotation" and by selective cutting. (Sept. 12, 1991 Kuhlmann Aff., Ex. N(16) at 2.) Thus, according to the Service, the Plan should satisfy plaintiffs' concerns since it creates numerous un-

disturbed habitats of smaller size and since much of the forest is harvested by long-rotation selective cutting. (*Id.*)

The idea that island biogeography is of uncertain application finds some support in articles presented at a 1982 workshop, the purpose of which was "to identify the current state of information and the future needs to implement the NFMA provision for diversity on national forests." Cooley, J.L. and Cooley, J.H. (eds.), Natural Diversity in Forest Ecosystems: Proceedings of the Workshop ("Workshop") at i (1984).[10] Referring to island biogeography, for example, one article (not written by Service personnel) states:

> Considerable disagreement still exists over the application of these equilibrium principles, first developed for islands, to landscape management. There is, however, no question that landscape patterns greatly affect species diversity of the individual communities on that landscape. An understanding of how specific landscape features (e.g., community size, separation, and the presence of corridors) affect the processes that determine diversity should be a primary research goal.

Christensen, N.L., and Peet, R.K., "Measures of Natural Diversity," Workshop at 54–55 (citations omitted). Similarly, according to an article by one of the 13 experts who supported plaintiffs' position before the Service:

> Because the degree of insularity created by habitat conversion can vary, it is appropriate to question greatly the applicability of results of studies of true islands to habitat islands.

> \* \* \* \* \* \*

[T]he application of conservation biology to the problem of minimum area requirements is still very much in the research and development stage. Nonetheless, responsible management of natural diversity on national forest lands requires that at

---

**9.** Under even-aged management, all or most of the trees in a stand are cut at one time, whereas uneven-aged management requires the selective cutting of individual trees. (Plan, App. A at 1–4.)

**10.** The court has reviewed this work because, though not part of the record, it contains an

article that plaintiffs rely upon in support of their position. (VII Admin.Rec. at 1873, VIII Admin.Rec. at 2164, citing Salwasser, H., J.W. Thomas and F. Samson, "Applying the Diversity Concept to National Forest Management," Workshop at 64; *supra* at 23–24.)

least these fundamental concepts be considered. However, they should be viewed merely as starting points for more comprehensive management planning efforts than have been required or even technically possible in the past.

Wilcox, B.A., "Concepts in Conservation Biology: Applications in the Management of Biological Diversity," Workshop at 164, 170.

The Service, however, did not reject plaintiffs' proposal only on the ground that its application was uncertain. Rather, the Service also predicted that the proposal would be measurably less beneficial than the forest plan in terms of preserving biological diversity. (Record of Decision at 17.) According to the Service's diversity index, a forest plan incorporating plaintiffs' proposed DMAs—Alternative 7—would, after 150 years, result in a "low" level of diversity, whereas the preferred forest plan would result in a "high" level. (*Id.; see supra* at 15.)

Though the Service did not directly consider principles of conservation biology, it did estimate, as noted above, the total acreage of "upland old growth" that would result from each alternative plan, as well as the number of acres of "wilderness, old growth, and other modified road management areas" found in blocks of 1,000 acres or more. (FEIS, App. D at 26–27.) Neither measure, however, was factored into the diversity index. Under the forest plan, according to the impact statement, "old growth will occur as scattered small areas across the Forest with the exception of large designated wilderness areas." (*Id.,* App. D at 26.)

### 3. The Chief's Decision Regarding Diversity

The Chief found that the diversity provisions of the NFMA and associated regulations establish "no additional requirements beyond those identified" in the regulations concerning population viability, management indicator species, and the protection of the habitat of threatened and endangered species. *See* 36 C.F.R. § 219.19. (I Admin.Rec. at 32.) Thus, by complying with these regulations, the Chief concluded, the Regional Forester ensured that the plan provided for biological diversity; no additional inquiry

into the principles of conservation biology or anything else, for that matter, was required. (*Id.* at 34–35.)

The Chief separately concluded that the Regional Forester was correct in declining to consider the predictions of island biogeography. "Island biogeography theory is not new," the Chief found, "but until there is conclusive, empirical evidence that the conclusions, hypotheses, or predictive capabilities for terrestrial ecosystems are valid, it is proper to acknowledge it as untested theory." (*Id.* at 36.)

### D. Analysis

The Service's assessment of biological diversity is said to have violated not only the NFMA but also NEPA and MUSYA. The latter statute requires that national forests be managed for the "multiple use" of various resources, including "recreation, range, timber, watershed, and wildlife and fish," and that the "periodic output" of such resources be maintained "in perpetuity ... without impairment of the productivity of the land." 16 U.S.C. §§ 528, 529, 531. This language, however, really just amounts to a statement of principle; it offers no guidance on how to assess the particular management activity at issue in this case. *See Perkins v. Bergland,* 608 F.2d 803, 806–7 (9th Cir.1979). Because the NFMA speaks directly to that issue, MUSYA need not be considered further.

NEPA requires that federal agencies take a "hard look" at the significant environmental consequences of proposed projects and disclose the same in a "detailed statement." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348–50, 109 S.Ct. 1835, 1844–45, 104 L.Ed.2d 351 (1989); 42 U.S.C. § 4332. The court finds no reason to treat this requirement separately from the NFMA requirement that forest plans "provide for the diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3). For each statute, the ultimate question, as plaintiffs present it, is the same: What must the Service do to analyze properly the effect of its forest plans on biological diversity? Again, the NFMA deals with that question specifically, whereas NEPA is of far broader application. Nevertheless, the court assumes that

the analytical standards developed under NEPA bear upon the quality of the analysis required to address the environmental factors identified in the NFMA.

Under NFMA regulations, forest planning in general must "provide for diversity of plant and animal communities and tree species," and management prescriptions, "where appropriate and to the extent practicable," must "preserve and enhance the diversity of plant and animal communities ... and the diversity of tree species." 36 C.F.R. §§ 219.-26, 219.27(g) (quoted in full, *supra* at 10). Diversity refers to "the distribution and abundance" of the objects in question. 36 C.F.R. § 219.3. Plaintiffs contend that the Service cannot have properly addressed the specified types and elements of diversity without attention to principles of conservation biology, for such principles are known to be critical to the viability of individual species and to an understanding of the structural differences among biological "communities."

Both the NFMA and NEPA require that environmental analyses be founded upon an "integrated" understanding of the major natural and social sciences. 40 C.F.R. § 1502.6; 36 C.F.R. § 219.5(a). In particular, NEPA requires consideration of "ecological" effects, "such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems." 40 C.F.R. § 1508.8. The NFMA, similarly, reveals an ecological bent in its emphasis on diversity of biological "communities." 16 U.S.C. § 1604(g)(3); 36 C.F.R. §§ 219.3, 219.26, 219.27(g). Plaintiffs contend that these explicit and implicit references to ecology, together with the "hard look" principle underlying NEPA, require the Service to take account of the basic ecological principles bearing on biological diversity, prominent among which are the principles of conservation biology.

Plaintiffs have presented the agency and the court with a wealth of authority in support of the theory that principles of conservation biology concerning habitat size, internal fragmentation, edge effects, and island biogeography are relevant to an ecosystem's ability to sustain a diversity of organisms. (*Supra* at 1537–39.) Defendants, further-more, have offered nothing that directly contradicts the plaintiffs' scientific analysis. Indeed, certain aspects of it have been endorsed by Department of Agriculture officials. (*Supra* at 1538.) Thus, the court can safely assume that the principles of conservation biology set forth by plaintiffs represent sound ecological theory.

Whatever their theoretical validity, however, considerable uncertainty seems to surround the question of how exactly these principles should be applied. Nowhere in plaintiffs' exhaustive briefs and supporting materials does there appear any suggestion of what methodology the Service should have used to incorporate principles of conservation biology into its planning process. Before the agency, plaintiffs came up with a fairly straightforward application of the science in their proposed creation of three DMAs. (*Supra* at 1538.) In this action, however, plaintiffs challenge not the Service's rejection of that proposal but rather its failure to consider the scientific principles upon which the proposal was based. (Dec. 20, 1991 Pl's Reply Br. at 4 n. 5.) It is therefore incumbent upon plaintiffs to explain how, precisely, those principles might have been considered; yet no such explanation has been given.

Further, plaintiffs have failed to respond to defendants' assertion that empirical studies of island biogeography have been conducted only in ecosystems differing substantially from the Nicolet and that such studies therefore do not have equal significance in that forest. (*Supra* at 1539.) Nor have plaintiffs answered defendants' statement that, according to at least one authority on conservation biology, biological diversity is not dependent on the maintenance of a few large habitats but also can be preserved by maintaining numerous small ones, as defendants purport to have done in their forest plan. (*Supra* at 1539.) Uncertainties such as these are reflected as well in articles written by non-Service scientists, who state, in effect, that while conservation biology is important and should be considered, how to consider it remains an open question. (*Supra* at 1539–40.)

Moreover, even if plaintiffs had identified some definite manner of applying conserva-

tion biology to forest planning, still the court would be reluctant to conclude that the Service acted irrationally in failing to embrace that science. When the NFMA regulations were first proposed in the late 1970s, the committee of scientists charged with reviewing them concluded that the regulations should not specify any particular manner of providing for biological diversity:

> [T]here remains a great deal of room for honest debate on the translation of [the NFMA's biological diversity provision] into management planning requirements and into management programs.

> \* \* \* \* \* \*

> [W]e believe it impossible to write regulations which are specific on how this [i.e., providing for biological diversity] is to be done in all regions, in a wide variety of vegetation types, and with a wide range of natural and human factors to consider.

> \* \* \* \* \* \*

> No matter how diversity is defined, its measurement is complex. We have studied the question as to whether the regulations should specify use of a diversity index to measure diversity and to monitor effects of management ... Although several mathematical formulations have been used in ecological research, there is no substantial agreement on the meaning or significance of the figures derived. Thus, we believe use of any of the present diversity indices would divert attention from the objective of considering variety throughout the planning process.

44 Fed.Reg. at 26609 (1979). The committee's comments on diversity make no reference to the scientific principles plaintiffs have discussed here. *Id.* at 26599–26630.

In view of the committee's decision not to prescribe a particular methodology and its failure to mention the principles that plaintiffs claim were by then well established, the court cannot fairly read those principles into the NFMA, particularly since their actual application, as noted above, is subject to debate. The court's unwillingness to impose upon the Service a particular scientific theory reflects not only the experience of the committee of scientists, but also the more general idea that in areas of scientific uncertainty the agency's choice of methodology is entitled to considerable deference. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); *Central Arizona Water Cons. Dist. v. United States Envtl. Protection Agency*, 990 F.2d 1531, 1540 (9th Cir.1993).

The court concludes, therefore, that the Service did not act irrationally in failing to base its diversity analysis on the principles of conservation biology set forth by plaintiffs.[11] This does not mean, of course, that the Service is relieved of its obligation to study the effect of the forest plan on biological diversity; it only means that, in doing so, the Service was not bound to apply the particular scientific theory that plaintiffs espouse. The court now turns to the distinct problem of whether the Service's chosen methodology rationally addressed the elements of diversity set forth in the NFMA.

■ The Service's diversity analysis consisted of three steps. First, the Service determined how each of the forest plans, including the one deemed optimal for diversity, would affect tree species and age-class composition in the forest's four socio-economic zones. (*Supra* at 1533–35.) This determination was believed to be important because of the assumption that different combinations of tree species and age-class are critical elements of habitat for various groups of species. (*Id.*) Second, the Service converted the prescriptions determined in the first step into percentages, representing the extent of each forest plan's conformity to the tree type and age-class prescriptions deemed optimal for diversity. (*Supra* at 1534–35.) Third, based on the results of the first step and on assumptions regarding habitat associations

---

11. Note the use of the past tense in this sentence. The court has been presented with information relating to the state of scientific knowledge as of the early 1980s and therefore knows nothing of what may have developed in this area since then. Thus, the court's conclusions regarding the rationality of defendants' mid–1980s analysis of biological diversity do not necessarily apply to its subsequent analyses.

and population density, the Service predicted how each forest plan would affect the population sizes of numerous management indicator species, as well as the likelihood of inbreeding for species subject to the population viability analysis. (*Supra* at 1536–37.)

For the most part, aside from criticizing this methodology for its failure to consider conservation biology, plaintiffs do not challenge the assumptions underlying the methodology or the manner in which it was conducted. Plaintiffs express some disagreement with the Service's choices of species for the analyses of management indicator species and population viability, but they have not explained how those choices were irrational or otherwise legally deficient. (Sep. 12, 1991 Pl.Statement of Facts at 94–98.)

Plaintiffs do contend, however, that the Service's analysis failed to examine the effect of the forest plan on diversity of biological "communities," as distinct from diversity of "species." The NFMA and associated regulations plainly require the Service to provide for both forms of diversity (though without explaining the difference between the two). *See* 16 U.S.C. § 1604(g)(3); 36 C.F.R. §§ 219.3, 219.26, 219.27(g) (all quoted in full, *supra* at 1532–33). Yet the Service, plaintiffs insist, really only considered diversity of species: it estimated, for each forest plan, the total acreage of various tree species and the aggregate populations of numerous animal species, but made no attempt to survey and study the broader communities in which these species live.

The Service does not purport to have examined biological communities directly. Rather, it assumed that a diversity of communities necessarily would follow from a diversity of habitats, that forested habitats are defined largely by the species and age-classes of trees they contain, and that, therefore, an adequate mixture of tree species and age-classes necessarily would yield a diversity of habitats. (*Supra* at 1533.) The importance of tree species and age-classes, according to the Service, is that they create or are associated with different physical structures (mainly canopy and understory), which in turn benefit different groups of animals.

(*Supra* at 1533–34.) Thus, though the Service paid particular attention to tree species and age-classes, it did so on the theory that these factors are representative of whole communities, a theory that plaintiffs have not directly contested.

The Service applied this theory by prescribing, for each of the forest's four socioeconomic zones, a mix of tree species, tree age-classes, and wildlife openings deemed optimal for wildlife diversity; the forest plans were then compared on the basis of their conformity to the optimal prescriptions. (*Supra* at 1534–35.) The general principles underlying the determination of optimal prescriptions are more or less evident. For the age-class variable, the idea was to achieve an even distribution among several age-classes; for the timber-type variable, to increase the acreage of those timber types deemed particularly beneficial for wildlife diversity; and for the wildlife investment variable, to increase the total acreage of wildlife openings throughout the forest. (*Supra* at 1533–35.)

If these general principles are evident from the FEIS, however, the manner in which they were translated into actual numbers is not. The FEIS does not explain, for example, why the Service chose 27.9 percent as the optimal forest-wide Aspen percentage, or why it chose 45 percent as the optimal percentage of Mixed Hardwoods in the 11– to 60–year age-class. (*Supra* at 1533–34.) If the Service used some particular formulae to arrive at these and other numbers underlying the diversity index, or at the parameters from which the numbers were selected, one would have hoped that the formulae would be set out in the FEIS or in a referenced document.

Nonetheless, the court does not find that the Service's method of determining the optimal prescriptions was irrational. The failure to describe that method in detail suggests a degree of arbitrariness in the selection of the optimal prescriptions, but not so much as to undermine the analysis as a whole. The general principles underlying the selection of optimal prescriptions are identified and explained, and plaintiffs have not attempted to show, nor has the court found, that the pre-

scriptions themselves are at all inconsistent with those principles. Further, there is no basis in the record for questioning the method by which the optimal prescriptions and the prescriptions of the various alternative plans were converted, for purposes of comparison, into the percentages shown in the diversity index.

Thus, the court concludes that the Service did not act irrationally in assuming that it could provide for an "abundance" of different biological communities—"abundance" being the first of two components of diversity under the NFMA, 36 C.F.R. § 219.3—by prescribing a certain mix of tree species, tree age-classes, and wildlife openings throughout the forest, and did not act irrationally in applying that assumption through development of the diversity index.

The second element of diversity of communities is their "distribution" throughout the planning area. 36 C.F.R. § 219.3. Though the parties really have not discussed this point, the court concludes that the Service rationally addressed this element of diversity as well. It did so by developing and examining the prescriptions deemed critical to diversity (i.e., tree type composition, age-class variety, and wildlife management investments) not only at the level of the forest as a whole but also at the level of the socio-economic zones, the four geographic regions into which the forest has been divided. (Supra at 1534–35.) Ideally, perhaps, the Service would have conducted a more precise analysis of community distribution, but in the absence of evidence that such an analysis was feasible, the court cannot find that the Service's more general approach was irrational.

For the foregoing reasons, the court concludes that the Service's analysis of biological diversity satisfied the requirements of the NFMA, NEPA, and associated regulations.

### IV. Recreation

#### A. Background

##### 1. Variety of Recreational Opportunities

Under the NFMA and MUSYA, the Service, in administering the national forests,

must "provide for multiple use and sustained yield" of forest resources, including "outdoor recreation." 16 U.S.C. § 1604(e)(1); 16 U.S.C. §§ 528, 529. Accordingly, Service regulations state:

> To the degree consistent with needs and demands for all major resources, a broad spectrum of forest and rangeland related outdoor recreation opportunities shall be provided for in each alternative [management plan].

36 C.F.R. § 219.21. Pursuant to this requirement, the Service in 1982 adopted a new system of classifying recreational opportunities called the "Recreation Opportunity Spectrum" ("ROS") (VIII Admin.Rec. at 2022.) The ROS, which is not itself prescribed by regulation, consists of six categories of recreational environments—"primitive," "semi-primitive nonmotorized," "semi-primitive motorized," "roaded natural," "rural," and "urban"—each of which is associated with its own narrative description and with rather precise standards of forest management.[12] (FEIS at 7–9; III Admin.Rec. at 497–515.)

The forest plan purports to set aside 63,-158 acres of land classified as semi-primitive nonmotorized (found in Management Areas 5, 6.2, and 9.2), 146,400 acres of land classified as semi-primitive motorized (found in Management Areas 1.2, 2.2, 3.2, 4.2, and 6.3), and 443,152 acres of land classified as roaded natural (found in Management Areas 1.1, 2.1, 3.1, 4.1, 8.1, 8.2, and 9.1). (Plan at 84–85.) On the ROS, the latter classification represents areas with "a high degree of user interaction," whereas the semi-primitive classification refers to areas of "relative" or "moderate" isolation. (FEIS at 7–9.)

Accordingly, the ROS applies different management standards to semi-primitive and roaded natural areas. In semi-primitive areas, trail density is limited to 2 miles per square mile, campgrounds contain no more than 10 sites, the road system is of "low density," power tools are used only during periods of "low or no recreation," and "vegetative management" is designed primarily to

---

12. The six ROS categories were intended to supplant the Service's previous, somewhat less refined practice, whereby recreational activities were classified as either "developed," "dispersed," or "wilderness." (VIII Admin.Rec. at 2022, 2026.)

"enhance recreational experience," with timber production as a secondary goal. (III Admin.Rec. at 499–502.) In roaded natural areas, by contrast, trail density is limited to 3 miles per square mile, campgrounds contain no more than 100 sites, the road system is of "moderate density," there is no restriction on the use of power tools, and "vegetative manipulation" is designed to "meet resource [i.e., timber production] and recreation objectives." (*Id.* at 503–04.)

The other significant difference between semi-primitive and roaded natural areas, according to the ROS, is in their respective "Visual Quality Objectives" ("VQOs"), which describe the conspicuousness of management activity. On the Nicolet, there are three possible VQOs. (Plan at 41–42.) A VQO of "retention" applies where "[m]anagement activities are not evident to the casual forest visitor." (*Id.* at 186.) A VQO of "partial retention" applies where "[h]uman activities may be evident but must remain visually subordinate to the characteristic landscape." (*Id.*) And a VQO of "modification" applies where "[h]uman activity may dominate the characteristic landscape but must, at the same time, follow naturally established form, line, color and texture." (*Id.*) According to the ROS, the modification VQO is *not* appropriate for areas designated semi-primitive, but may be appropriate for areas designated roaded natural. (III Admin.Rec. at 500, 502, 504.)

Berlin, the Nicolet Supervisor, was not a fan of the ROS. The problem with it, in his view, was that its standards for logging and road construction would effectively eliminate timber production on lands classified as semi-primitive. (VIII Admin.Rec. at 2016.) Berlin felt that such a restriction on the use of the land was appropriate only in congressionally-designated wilderness area. (*Id.* at 2017.) Accordingly, Berlin proposed early in the planning process that the semi-primitive nonmotorized classification in the Nicolet be reserved exclusively for wilderness area, leaving the rest of the forest under the roaded natural classification. (*Id.* at 2021.)

In a 1982 report, however, the regional office objected to this approach, calling "unsupportable" the Nicolet office's "fear of identifying non-motorized recreation outside of wilderness." (*Id.*) The regional office therefore directed the Nicolet office to identify additional semi-primitive areas, both motorized and nonmotorized, outside of wilderness area. (*Id.*) Later in the planning process, after the Nicolet office submitted its draft forest plan, the regional office reiterated its earlier criticism and instructions, stating:

> The recreation experience choices to be given to the public are only two on the Nicolet—either wilderness or a roaded natural experience. The preferred alternative does not adequately address the issues of too many roads and conflicts between motorized and non-motorized recreationists.
>
> Suggest a semi-primitive recreation opportunity outside of wilderness should be provided.

(VIII Admin.Rec. at 2054.)

The Nicolet office apparently responded to that suggestion by reclassifying as semi-primitive a number of areas previously classified as roaded natural. To justify the switch, the Nicolet office directed that the density of open roads (as opposed to the density of all roads) in the reclassified areas be reduced to about half the density of open roads in the areas that remained roaded natural. (Plan at 87, 95, 103, 111, 130; VIII Admin.Rec. at 2057.) Also, it was directed that the reclassified areas be kept "visually more sensitive" than the roaded natural areas. (Plan at 87, 95, 103, 111.)

But the regional office disapproved of the Nicolet office's approach to reclassification, stating:

> This road status change is not sufficient by itself to warrant changing [roaded natural area] to [semi-primitive]. The claim that the [formerly roaded natural land] now constitutes a [semi-primitive] setting defeats the purpose of the ROS concept.
>
> The Recreation Opportunity prescription ... should either remain Roaded Natural and include a reduced open road density prescription in order to be consistent with Regional direction and the appropriate ROS Class prescription or if the Forest

wants to increase the supply of [semi-primitive land], reduce the road density, reduce the size of clearcuts to 25 acres and change the Visual Quality Objectives to include a larger percentage of Partial Retention, Retention, and reduce the amount of Modification.

(VIII Admin.Rec. at 2057.) The Nicolet office declined, however, to make these changes, because it concluded:

[T]he character of [the reclassified] areas is such that open road density is the determining factor as to whether the public views the areas as roaded natural or semi-primitive.... Additionally ... these management areas do have higher visual objectives.

(*Id.*)

Consistent with this position, much of the land designated semi-primitive in the forest plan differs from land designated roaded natural primarily with respect to the open road densities associated with each.[13] In the roaded natural areas, according to the plan, open road density averages 4 miles per square mile, whereas it averages 2 miles per square mile in the semi-primitive motorized areas. (Plan at 87, 95, 103, 111.) The two types of areas also differ in that the modification VQO is applied somewhat more frequently in roaded natural areas than in semi-primitive motorized areas (though it is applied in both) so the latter is said to be "visually more sensitive." (*Id.*)[14] But otherwise the plan does not treat roaded natural and semi-primitive motorized areas differently. The FEIS does not distinguish between these areas in quantifying timber production, road construction, or any other management activities. (*See, e.g., Id.* at 87–90.)

Open road density also appears to be the primary factor distinguishing roaded natural areas from a significant portion of the forest plan's semi-primitive *non*motorized land, represented by Management Area 6.2 (13,600

---

**13.** The plan's semi-primitive motorized area, aside from wetlands represented by Management Area 6.3 (58,600 acres), is found in Management Areas 1.2, 2.2, 3.2 and 4.2 (a total of 87,800 acres), and most of its roaded natural area is found in Management Areas 1.1, 2.1, 3.1, and 4.1 (a total of 356,300 acres). (Plan at 84–85.) Roaded natural land also is found in Management Areas 8.1, 8.2, and 9.1 (a total of 86,852 acres).

**14.** The VQO for a given area is based upon the area's "scenic value" and upon the "sensitivity" of the area's users to its visual quality. (Plan, Ex. E at 1–2.) As scenic value and sensitivity increase, the permissible level of management activity decreases. (*Id.*) The proper VQO is determined by reference to a "VQO Matrix," which appears below. On the matrix, Classes A through C represent areas of "distinctive," "common," and "minimal" scenic value, respectively; levels 1 through 3 (subdivided by foreground and middleground) represent the "highest," "average," and "lowest" user sensitivities, respectively; and R, PR, and M represent the VQOs of retention, partial retention, and modification, respectively.

| SCENIC VALUE | SENSITIVITY LEVEL | | | | |
|---|---|---|---|---|---|
| | FG1 | MG1 | FG2 | MG2 | 3 |
| A | R | R | PR | PR | M |
| B | R | PR | PR | M | M |
| C | PR | PR | M | M | M |

(*Id.* Ex. E at 2.)
Sensitivity level 3 is recognized in roaded natural areas but not in most SPM areas. (*Id.* at 92, 100, 108, 116, 139–40.) That, apparently, is what restricts the use of the modification VQO in SPM areas.

acres).[15] This land is subject to roughly the same degree of timber production as that prescribed for Management Areas 1.1 through 4.2, where timber production and motorized recreation are to be emphasized. The plan provides that timber harvesting will take place on 36 percent of Management Area 6.2 land, while that rate for Management Areas 1.1 through 4.2 is 30 percent, 48 percent, 47 percent, and 43 percent, respectively. (*Id.* at 84–5, 90, 98, 106, 114, 134.) Further, the plan does not indicate that the VQOs for the semi-primitive nonmotorized land in Management Area 6.2 will be at all different than those for the roaded natural land in Management Areas 1.1, 2.1, 3.1, and 4.1. (*Id.* at 92, 100, 108, 116, 136.)

Acknowledging the similarity between the semi-primitive nonmotorized land in Management Area 6.2 and roaded natural land elsewhere, the Regional Forester stated during the administrative appeal that he would offer an amendment to the plan reducing the intensity of timber harvesting and road building in Management Area 6.2. (V Admin.Rec. at 1384.) As of yet, however, no such amendment has been proposed.

2. Inventory of Recreational Resources

NFMA regulations provide that forest planning must "identify" available recreational resources and take into account the anticipated demand for such resources. 36 C.F.R. §§ 219.21(a)–(c), (f); 16 U.S.C. § 1604(f)(3). The Nicolet office's "inventory" of existing recreational resources—quantified in terms of total acreage under different ROS classifications—was revised repeatedly throughout the planning process. In an October 1981 report, the office estimated that the Nicolet contained 21,500 acres that could be classified as semi-primitive nonmotorized and 18,000 acres that could be classified as semi-primitive motorized, a total of 39,500 existing semi-primitive acres. (Nov. 15, 1991 Def.Br., Ex. H at 8.) According to a document submitted by defendants, however, those numbers had changed by January 1982 to 10,200

acres of semi-primitive nonmotorized and 120,000 acres of semi-primitive motorized, a total of 130,200 existing semi-primitive acres. (*Id.*, Ex. K at 6.) By July 1982, the numbers had changed again, this time to 20,450 acres of semi-primitive nonmotorized and 10,000 acres of semi-primitive motorized, a total of 30,450 existing semi-primitive acres. (VIII Admin.Rec. at 2024.)

Then, in the draft environmental impact statement issued in November 1984, the estimate of existing semi-primitive nonmotorized area grew to 33,000 acres, apparently because of an increase in the amount of congressionally-designated wilderness area, and the estimated semi-primitive motorized acreage fell to zero. (VII Admin.Rec. at 1772.) But in the final environmental impact statement, issued in August 1986, the inventory estimates were revised to 33,000 acres of wilderness-semi-primitive nonmotorized, 11,000 acres of non-wilderness-semi-primitive nonmotorized, and 13,000 acres of semi-primitive motorized, for a total of 57,000 existing semi-primitive acres. (FEIS at 4–12, table 4–5.)

Defendants contend that the October 1981 inventory, showing 39,500 existing semi-primitive acres, was relied upon as the base inventory. (Feb. 4, 1992 Def.Br. at 110.) This inventory, as plaintiffs are at pains to point out, was not derived from an actual map of the forest. There are maps in the record purporting to show ROS inventories (I Admin.Rec. at 218–220; VIII Admin.Rec. at 2070–72), but plaintiffs claim that the maps do not agree with the October 1981 inventory, and, at any rate, defendants do not contend that the maps were the source of that inventory. Instead, according to an explanation preceding it, the October 1981 inventory was based upon a conversion of existing data from the Recreation Information Management System ("RIMS"), which estimates the amount of time visitors to the forest spend on a variety of different recreational activities. (Nov. 15, 1991 Def.Br., Ex.

---

**15.** Outside of Management Area 6.2, semi-primitive nonmotorized land is found in wilderness area, represented by Management Area 5 (33,258 acres), or in river corridors, quarter mile-wide strips of land running along the sides of the forest's rivers, represented by Management Area 9.2 (16,300 acres). Management prescriptions for these areas, in contrast to Management Area 6.2, are quite different than those for areas designated roaded natural. (*Id.* at 124–28, 152–55.)

H at 7–8.) The assumption here was that existing *supply* of recreational resources, the ROS measurement, could be roughly determined by reference to the existing *use* of such resources, the RIMS measurement. (*Id.*, Ex. H at 7.) An "ROS Users Guide" specifically recommends the use of RIMS data in generating ROS statistics. (*Id.*, Ex. F at 23.)

The difficulty with this approach is that the RIMS and ROS statistics do not convert easily: the RIMS data show the amount of time (in "visitor days per year" (*see supra*, note 2)) spent on various activities (hunting, fishing, and "developed," "dispersed," and "wilderness" recreation), whereas the ROS data show the amount of space (in acres) available in different recreational environments ("semi-primitive," "roaded natural," etc.). The difficulty of conversion was only compounded by the newness of the ROS—it was actually in development during part of the planning period—which made for considerable uncertainty as to how its various categories and standards should be applied. A memorandum accompanying the January 1982 inventory, showing 120,000 existing semi-primitive acres, states:

> Overall there is a concern expressed about the consistent use of the ROS classes. To date, it is evident that there are inconsistencies between interpretations of those classes on various units. Whether we can get this consistency during this round of planning is questionable without additional training on the part of our recreation staffs and planners.

(Nov. 15, 1991 Def.Br., Ex. K at 4.) Similarly, in the administrative appeal, the Regional Forester explained that the differences among the various inventories were "due mainly to the changing ROS concepts." (V Admin.Rec. at 1385.)

3. Anticipated Demand for Recreational Resources

Forest planning, as noted above, must take into account the demand for, as well as the supply of, various types of recreational resources. The Nicolet Forest Plan and FEIS predict that the supply of land for "dispersed" and "wilderness" recreation, which is roughly equivalent to "semi-primitive" land, will be more than adequate to meet the demand for such land over the next several decades. (FEIS, App. B at 179–183; Plan at 6–8.) This conclusion is based in part on the belief that the rate of increase of demand for wilderness recreation on the Nicolet will be "below the national average." (FEIS, App. B at 183.) According to the FEIS, the sources for these demand projections included "the Wisconsin Outdoor Recreation Plan (1977), the Upper Great Lakes Regional Recreation Planning Study (1974), Wisconsin DNR Fish and Wildlife Comprehensive Plan (1979), and local county plans." (*Id.*, App. B at 179.)

Plaintiffs contend, however, that the Nicolet office's demand projections are inconsistent with those set forth in Wisconsin's "1986–1991 Statewide Comprehensive Outdoor Recreation Plan" ("SCORP"), which predicted, according to a report prepared for plaintiffs, "that the current supply of [outdoor recreation] facilities in Wisconsin was not adequate to meet the public demands." (III Admin.Rec. at 605–606.) Plaintiffs do not indicate whether the Wisconsin SCORP is part of the record in this case, and the court has not come across it.

4. Decision of the Chief Regarding Recreation

The Chief found that the Nicolet office properly applied the ROS system in developing the forest plan, thus satisfying the requirement that the plan provide for a "broad spectrum of . . . recreation opportunities." (I Admin.Rec. at 21.) That finding was based in part on the following assertion of the Regional Forester:

> The cited examples of differences of opinion between the Forest and Regional Office staff over the concept of semiprimitive areas are from early in the planning process, and do not fairly represent the Nicolet's philosophy reflected in the final planning decisions.

(*Id.*) The Chief's decision also incorporated the Regional Forester's stated intention to offer an amendment to the Forest Plan that would modify the intensity of management activities in Management Area 6.2. (*Id.* at 4.)

On the question of resource inventories, the Chief found that the appearance of the

ROS inventory in the FEIS and of a recreation-demand inventory in the Forest Plan "make it apparent that inventories associated with the recreation resource were considered in the forest planning process for the Nicolet National Forest." (I Admin.Rec. at 20.) The Chief did not discuss the significance of the differences among the various ROS inventories, or of the inconsistency between the FEIS and SCORP demand predictions.

B. Analysis

1. Variety of Recreational Opportunities.

 Plaintiffs contend that the Nicolet Forest Plan fails to provide for "a broad spectrum of forest and rangeland related outdoor recreation opportunities," as required under 36 C.F.R. § 219.21 (quoted in full, *supra* at 1544), because its allotment of semi-primitive land does not provide an adequate opportunity for remote recreation. Although the facts underlying this claim largely concern the Nicolet office's application of the ROS guidelines (*see supra* at 1544–47), it is important to note that the ultimate question here is *not* whether those guidelines were properly applied. The guidelines themselves are not prescribed by statute or regulation; they are, instead, the Service's directions to its staff on how to interpret and implement the "broad spectrum" requirement of 36 C.F.R. § 219.21. The guidelines thus have the status of "interpretive rules" and, as such, are not actually binding upon the Service. *Nat'l Latino Media Coalition v. Federal Communications Comm'n,* 816 F.2d 785, 788 (D.C.Cir.1987); *Dyer v. Sec'y of Health and Human Services,* 889 F.2d 682, 685 (6th Cir.1989); Davis, Administrative Law Treatise § 7.11 at 100 (2d ed. 1979). Rather, for purposes of this claim, the Service is bound only by the far less precise language of the "broad spectrum" regulation itself.

If not directly binding, however, the ROS guidelines certainly represent an authoritative interpretation of the regulatory language, and so in that sense they are relevant to the court's analysis. In particular, the guidelines reflect the view, shared by plaintiffs, that a "broad spectrum" of recreational opportunity necessarily includes the opportunity for recreation in "semi-primitive" or "remote" areas where roads, motorized vehicles, logging, and the like are scarce or nonexistent. (*Supra* at 1544–45.) The question, therefore, is whether the Service acted irrationally in concluding that the Nicolet Forest Plan in fact provided for that kind of recreational opportunity.

The Plan does, of course, identify a quantity of land possessing characteristics that make it suitable for remote recreation: the 33,000 acres of congressionally-designated wilderness area. Defendants contend that this amount of land, about five percent of the forest, is more than adequate to meet the anticipated demand for remote recreation. That position is called into question, however, by the Regional Office's comments to the Nicolet office, in which the latter's initial refusal to identify semi-primitive nonmotorized land outside of wilderness area is criticized as failing to address the problem of "conflicts between motorized and non-motorized recreationists." (*Supra* at 1545.) Thus, there appears to be at least a genuine issue of fact as to whether the demand for remote recreation could be satisfied by the supply of wilderness area alone.

In response to the Regional Office's criticism, the Nicolet office reclassified more than 100,000 acres of land from roaded natural to semi-primitive motorized (87,800 acres) and semi-primitive nonmotorized (13,600 acres). (*Supra* at 1545–46.) Plaintiffs contend, however, that the reclassification did not create any added opportunity for remote recreation because the VQOs and other management standards associated with the reclassified land were not significantly altered. Defendants all but conceded that point, at least in part, when they undertook to submit an amendment to the plan that would significantly reduce the amount of road building and logging in the areas that had been reclassified as semi-primitive nonmotorized (represented by Management Area 6.2), though they did not offer a similar amendment with respect to the land that was reclassified as semi-primitive motorized. (*Supra* at 1546–47.)

Though defendants have not yet submitted the promised amendment, the court assumes they will, for that is what the Chief ordered them to do and it is the Chief's decision that this court is charged with reviewing. (Defendants' failure to submit an amendment in accordance with the Chief's order is a matter, the court presumes, to be presented to the Chief in the first instance.) The court further assumes, because plaintiffs have not offered evidence to the contrary, that the amendment would ensure that the management standards for the land reclassified as semi-primitive nonmotorized would be appropriate to that classification. Finally, then, the issue is whether the 33,000 acres of congressionally-designated wilderness area, together with the 13,600 acres of land reclassified as semi-primitive nonmotorized, could rationally be said to provide an opportunity for remote recreation.

The answer, the court concludes, is yes. It seems to be true, as plaintiffs assert, that the Forest Plan is "obviously biased against remote recreation." (Pls.' Jan. 21, 1992 Br. at 56.) The pertinent regulation, however, does not require equal or proportional treatment of different recreational opportunities. Instead, it requires only that, "[t]o the degree consistent with needs and demands for all major resources, a broad spectrum of ... recreation opportunities ... be provided for." So vague is this language that it simply cannot be interpreted as compelling the Service to do more than provide *some* opportunity for remote recreation. Plaintiffs may have shown that there is not a great opportunity for such recreation under the Forest Plan, but they have not shown that there is no real opportunity for it. Thus, the court finds that the Service did not act irrationally in concluding that the Forest Plan satisfied the broad-spectrum requirement of 36 C.F.R. § 219.21.

2. Inventory of Recreational Resources

■ The NFMA requires that forest plans be "based on inventories of the applicable resources of the forest," which would include its recreational resources. 16 U.S.C. § 1604(f)(3). Similarly, NFMA regulations provide that "[f]orest [p]lanning shall identify

... recreation opportunities on the National Forest System lands." 36 C.F.R. § 219.-21(a)(3). Plaintiffs contend that the Service violated these provisions by permitting its inventories of existing ROS acreage to fluctuate and by failing to take the inventories from an actual map of the forest, particularly when maps showing ROS acreage were available. Plaintiffs have not, however, addressed the Service's assertions that the inventory it relied upon, the October 1981 inventory, was derived from a conversion of RIMS data, and that the differences between that inventory and the final FEIS inventory were due mainly to changing notions of how to apply "ROS concepts." (*Supra* at 1547–48.)

The court finds nothing inherently irrational in the Service's conversion of RIMS data, showing existing use, to ROS data, showing existing supply. (*Supra* at 1547–48.) Perhaps, had plaintiffs looked into it, they could have shown that the use of forest resources does not provide an accurate basis for determining their supply, or that the RIMS and ROS standards of measurement simply do not convert. There has been no attempt to make either showing, however, and so the court must assume that the RIMS data provided a rational basis for generating the ROS inventory.

Further, the court concludes that the fluctuation of the ROS inventory does not by itself establish that the Service acted irrationally. Instead, it establishes only that the Service's method of counting recreational resources changed over time. The Service has offered a plausible explanation for why it changed—uncertainty as to the proper application of the ROS—and plaintiffs have submitted nothing that calls this explanation into question. It scarcely need be added that there is nothing irrational about the Service's uncertainty in this regard, given the newness of the ROS and the relative flexibility of the ROS standards and categories.

3. Anticipated Demand for Recreational Resources

■ Concerning the demand for recreational resources, NFMA regulations provide:

(c) Planning alternatives shall include consideration of . . . recreation opportunities *responsive to current and anticipated user demands.*

(d) In formulation and analysis of alternatives . . . interactions among recreation opportunities and other multiple uses shall be examined. This examination shall consider the impacts of the proposed recreation activities on other uses and values and the impacts of other uses and activities associated with them on recreation opportunities, activities, and quality of experience.

(e) Formulation and evaluation of alternatives under paragraphs (c) and (d) of this section shall be *coordinated to the extent feasible with present and proposed recreation activities of local and State land use or outdoor recreation plans, particularly the State Comprehensive Outdoor Recreation Plan,* and recreation opportunities already present and available on other public and private lands, *with the aim of reducing duplication in meeting recreation demands.*

36 C.F.R. § 219.21 (emphasis added). Plaintiffs contend that the Service's estimate of future demand for semi-primitive recreation is flatly contradicted by the much higher estimate shown in Wisconsin's 1986–1991 SCORP, thus violating the requirement of the above regulation that the Service's efforts to meet demand be "coordinated" with those of the state.

An initial difficulty with this claim is that the SCORP itself does not appear to be included in the record, but instead is merely summarized in a report prepared for plaintiffs. (*Supra* at 1548.) In addition, plaintiffs' assertion assumes that the state-wide demand trends predicted in the SCORP apply equally to the Nicolet—an assumption that, while not unreasonable, is at least subject to debate, given a statement in the FEIS that the demand situation on the Nicolet is unique. (FEIS, App. B at 183.)

Setting these problems aside, however, the court concludes that the Service's failure to follow the demand estimates of Wisconsin's SCORP does not violate the provisions of 36 C.F.R. § 219.21(e). Those provisions require the Service to "coordinate" its forest plan not with the demand estimates of state and local plans, but with the "recreation activities" of such plans, and to do so not for the purpose of ensuring that demand is met, but, on the contrary, for the purpose of "reducing duplication in meeting recreation demands." Thus, inconsistency between the Service's demand estimates and those of the state does not even implicate, much less violate, the coordination requirement of 36 C.F.R. § 219.21(e).

The court further concludes that such inconsistency does not establish that the Service acted irrationally in arriving at its own demand estimates, which presumably must be developed in order to comply with the requirement of 36 C.F.R. § 219.21 that the Service consider "recreation opportunities responsive to current and anticipated user demands." Plaintiffs have not attempted to identify any analytical flaw in the Service's method of predicting demand for recreational resources. Absent evidence of some such flaw, the court is in no position, given the deferential standard of review, to second-guess the results of that method, even if they disagree with the results of other studies.

For the foregoing reasons, plaintiffs' claims concerning the forest plan's treatment of recreation will be dismissed.

### V. Range of Alternatives

#### A. Background.

In developing and selecting a forest plan, the Service must consider, as discussed in greater detail below, "a broad range of reasonable alternatives." 36 C.F.R. § 219.12(f); 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.-14(a). The Service in this case formulated eight alternative forest plans, each with its own management emphasis and its own prescriptions for timber production and for road maintenance and construction.[16] (FEIS,

---

16. The FEIS describes each alternative's management emphasis as follows:
 Alternative 1. A projection of current management into the future. . . .

Alternative 2. Emphasizes the most cost efficient level of outputs.

Chpt. 2 at 40–81.) The rather complex manner by which these alternatives were developed is explained in detail in the FEIS and, for the most part, need not be related here. (*See* FEIS, App. B.) Of interest in this case, rather, is the extent to which the alternatives differ from one another in their various management prescriptions.

Six of the alternatives prescribe identical levels of total annual timber harvest, measured in millions of board feet ("MBF") per year:

### MBF/YR, BY ALTERNATIVE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|----|----|----|----|----|----|----|----|
| 72 | 97 | 97 | 97 | 97 | 97 | 65 | 97 |

(FEIS, Chpt. 2 at 58–59, Table 2–16.) [17] According to the FEIS, 97 MBF/YR represents the expected demand, or "consumption level," for timber during the 1986–1995 period; the total *supply* of timber for that period (assuming it is to be harvested to achieve a "sustained yield") is estimated at 182 MBF/YR. (FEIS, App. B at 50, Table B–2.) The reason most of the alternatives set the total harvest quantity at the expected consumption level is that this maximizes the total value of the forest's "priced outputs," meaning those to which a monetary value can be assigned. (*Id.*, App. B at 176–77.) (The other priced outputs are the various recreational uses of the forest. (*Id.*, App. B at 48.)) By maximizing priced outputs, setting timber harvests at consumption level also maximizes the forest's "present net value," which is "the difference between the discounted value of priced outputs and all Forest Service management and investment costs over 150 years." (*Id.*)

According to the FEIS, present net value is an important measurement, and was used as criterion upon which the alternatives were compared and evaluated, because it is the key variable in determining how each alternative would affect the forest's "net public benefits." (FEIS, App. B at 48–49.) The central role of that calculation in forest planning stems from the following NFMA regulation:

> [Forest plans] shall provide for multiple use and sustained yield of goods and services from the National Forest System in a way that maximizes long term *net public benefits* in an environmentally sound manner.

36 C.F.R. § 219.1(a) (emphasis added). Here is how the FEIS explains the relationship between present net value ("PNV"), nonpriced outputs—examples of which include "providing habitat for wolf and effects on local income and jobs" (FEIS, App. B at 49)—and net public benefits:

> The alternatives are designed and analyzed to achieve their goals and objectives

Alternative 3. Emphasizes the production of outputs which return money to the U.S. Treasury (market emphasis).

Alternative 4. Satisfies the projected demand for softwood (pine, fir, and spruce) timber products over the next 50 years.

Alternative 5. Emphasizes production of [sawtimber]. This is the preferred alternative.

Alternative 6. Emphasizes a favorable habitat for wildlife—both game and nongame. . . .

Alternative 7. Emphasizes a natural appearing forest and provides high quality recreation. . . .

Alternative 8. Meets the projected demand for hunting for the next 50 years.

(FEIS, Chpt. 2 at 19.)

17. Based on these prescriptions, the impact statement projects total annual timber harvest for each of the four decades following 1995. (*Id.*) Because these are projections rather than prescriptions—the plan governs only through 1995—they are not relevant to the court's analysis. *Resources Limited, Inc. v. Robertson*, 8 F.3d 1394, 1401 (9th Cir.1993).

in a manner that achieves the greatest excess in the value of priced outputs in relation to their cost while meeting all specified constraints and objectives for nonpriced outputs.... Net public benefits therefore can be defined as the sum of PNV plus the ... value of nonpriced outputs.

(FEIS, App. B at 49.) The centrality of priced outputs to the Service's estimation of net public benefits, and the emphasis placed on maximizing the net public benefits of each alternative, explain generally why the Service found it necessary to gain as much value from timber harvesting as possible. (*Id.,* App. B at 177.) The assumption here was that timber could be harvested at demand levels without reducing the total value of other priced outputs or of nonpriced outputs.

When the numbers for annual timber harvest are broken down by other criteria, a somewhat greater degree of variation among the alternatives is revealed. The following table sets forth annual harvest by timber type:

MBF/YR, BY ALTERNATIVE

| TIMBER TYPE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Jack Pine | 4.8 | 1.3 | 0.6 | 0.8 | 3.7 | 3.6 | 0 | 1.9 |
| Balsam Fir | 4.8 | 2.0 | 1.4 | 2.2 | 3.8 | 1.7 | 1.0 | 2.1 |
| Red Pine White Pine White Spr. | 18.7 | 18.2 | 19.5 | 28.7 | 22.8 | 21.5 | 20.2 | 17.5 |
| Lowland Conifer | 0.6 | 0 | 0 | 3.8 | 0 | 0 | 0 | 0 |
| Mixed Hardwood | 25.8 | 44.6 | 60.5 | 26.6 | 42.6 | 43.2 | 23.9 | 23.3 |
| Aspen | 17.3 | 30.6 | 15.0 | 34.5 | 24.1 | 26.8 | 19.7 | 52.1 |

(*Id.*)

The alternatives also vary by the amount of acreage subject to uneven age management (selective cutting) as opposed to even age management (crosscutting):

### THOUSANDS OF ACRES, BY ALTERNATIVE

| HARVEST METHOD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| UNEVEN AGE | 190 | 115 | 148 | 122 | 165 | 113 | 98 | 4 |
| EVEN AGE | 254 | 331 | 307 | 343 | 292 | 343 | 179 | 416 |

(*Id.,* Chpt. 2 at 72, Table 2–23; *see supra* at note 9.)

Another basis for comparison of the alternatives is the type of road system they prescribe. In the table below, listing road mileages projected for 1996, "level" refers to quality of construction: A– and B–level roads are "fully surfaced" and "suitable for passenger car travel" in all weather conditions; C– and D–level roads generally are not fully surfaced and are not suitable for passenger car travel, particularly "during off season and wet periods." (Plan at 78–89.)

### MILES IN 1996, BY ALTERNATIVE

| ROAD LEVEL | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| A & B | 940 | 947 | 947 | 939 | 939 | 939 | 939 | 939 |
| C & D | 3824 | 3474 | 3479 | 3476 | 3502 | 3500 | 3348 | 3461 |
| TOTAL | 4764 | 4421 | 4426 | 4415 | 4441 | 4439 | 4287 | 4400 |

(*Id.,* Chpt. 2 at 66.)

The amounts of constructed, closed, and "revegetated" roads prescribed for each alternative are listed in the following table. Revegetation is what happens to "low standard" roads when they are closed for a long period of time.

| MILES BY 1996, BY ALTERNATIVE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ROAD TREATMENT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Constructed | 79 | 70 | 80 | 56 | 93 | 83 | 1 | 61 |
| Closed | 98 | 148 | 266 | 133 | 357 | 145 | 276 | 162 |
| Revegetated | 0 | 334 | 339 | 326 | 337 | 329 | 399 | 346 |

(*Id.*, Chpt. 2 at 49, 66.)

**B. Decision of the Chief Regarding Range of Alternatives**

The Chief concluded that given the "established goals and objectives" of forest management, there was satisfactory variation among the alternative forest plans, even if they prescribed relatively similar "output levels" for certain resources. (I Admin.Rec. at 41–43.)

**C. Analysis**

■ The Forest Service is required to consider a "broad range of reasonable alternatives" in developing its forest plans, 36 C.F.R. § 219.12(f); 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.14(a), which means that the range of alternatives explored must be "sufficient to permit a reasoned choice." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir.1992); *Eagle Foundation, Inc. v. Dole*, 813 F.2d 798, 807 (7th Cir.1987). Plaintiffs contend that the eight alternatives explored by defendants did not permit a reasoned choice because most of them prescribe identical or nearly identical levels of timber harvesting and road maintenance.

Defendants contend, however, that while the alternative plans may be similar in the total "output levels" they prescribe, they achieve those levels in substantially different ways, a position more or less borne out by the charts set forth above. Six of the alternatives prescribe an annual timber harvest of 97 MBF/YR, but the composition of the harvest by timber type and harvest method varies considerably under each of the plans. (*Supra* at 1553–54.) The same six plans also prescribe a comparable amount of total road mileage, but they differ when one considers the quality of roads being maintained or the quantity of roads being constructed, closed, or revegetated under each plan. (*Supra* at 1554–55.) Defendants insist that these differences are environmentally significant, and plaintiffs have not tried to prove otherwise.

Granted that there are important differences among the alternative plans, however, it is nonetheless true that most of them are constrained by common parameters of total harvest level and total road mileage, and so the question is whether NEPA precludes the Service from imposing such parameters. The Service is plainly "entitled to identify *some* parameters and criteria—related to Plan standards—for generating alternatives to which it would devote serious consideration," for otherwise it "could generate countless alternatives ... [including ones] known to be unacceptable at the outset." *Idaho Conservation League*, 956 F.2d at 1522 (emphasis in original). On the other hand, if narrow parameters are imposed in advance on all the important variables, then the NEPA inquiry is rendered meaningless or avoided altogether. Agencies may not engage in such a patently result-driven examination of alternatives. *California v. Block*, 690 F.2d 753, 769 (9th Cir.1982); *Citizens for Envtl. Quality v. United States*, 731 F.Supp. 970, 990 (D.Colo.1989).

There is no doubt that the common constraints the Service imposed on the alternative plans substantially affected the range of alternatives that were generated. Nevertheless, the court concludes that the use of these constraints did not render the FEIS inadequate. The constraints themselves were not arbitrary but rather were designed to ensure that the Nicolet would meet the anticipated demand for its timber. (*Supra* at 1552.) And the perceived need to meet demand

stemmed from the Service's desire to maximize the forest's "priced outputs," which in turn would maximize its "net public benefits," as required by regulation. (*Supra* at 1552.) Even with the harvest-level and road-mileage parameters in place, moreover, the remaining related variables (harvest composition and method, road quality and treatment) were sufficient to generate meaningful alternatives with respect to timber production and road maintenance. (*Supra* at 1553–54, 1555.)

Equally or more important, however, is the fact that two of the alternative plans, Alternatives 1 and 7, were freed of the harvest-level and road-mileage constraints placed on the other six, so that the constraints themselves did not go unexamined. In particular, Alternative 7, the Service's approximation of plaintiffs' preferred plan, prescribed a much lower level of timber harvesting and road building than any of the others. Plaintiffs acknowledge as much, but contend that the Service was required to consider "middle ground alternatives" between Alternative 7 and the others which would stand a more realistic chance of being adopted. (Jan. 21, 1992 Pl.Br. at 66.) The court might be inclined to agree had plaintiffs proposed such an alternative during the public comment period, but they did not. *See Eagle Foundation,* 813 F.2d at 807–808 (discussing the Department of Transportation's obligation to consider alternate highway routes under 49 U.S.C. § 303(c)).

Thus, because the harvest-level and road-mileage parameters selected by the Service were not in themselves arbitrary and were not applied to all of the alternatives, and because there remained meaningful variation among the alternatives to which the parameters were applied, the court concludes that the range of alternative plans set forth in the FEIS was adequate under NEPA and associated regulations. This conclusion finds support in a recent decision of the Ninth Circuit Court of Appeals, which held that the range of alternatives considered in developing a plan for Montana's Flathead National Forest was adequate even though most of them were constrained by "a parameter that the harvest level remain at or near current lev-

els." *Resources Ltd., Inc. v. Robertson,* 8 F.3d 1394, 1402 (9th Cir.1993).

## VI. Conclusion

For the foregoing reasons, the court concludes that plaintiffs have failed to raise a genuine issue of fact as to whether defendants violated the relevant provisions of the NFMA, NEPA, MUSYA, or associated regulations in developing the Nicolet Forest Plan, and therefore plaintiffs' claims will be dismissed.

**IT IS THEREFORE ORDERED** that plaintiffs' September 12, 1991 motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that defendants' November 15, 1991 motion for summary judgment is **GRANTED** and this action **DISMISSED.**